**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **RONALD L. THOMAS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )　　**Case number 4:09cv0957 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Ronald L. Thomas' application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383b, is before the Court for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Mr. Thomas has filed an opening and reply brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Ronald Thomas (Plaintiff) applied for SSI in November 2005, alleging he was disabled because of a plastic hip bone and schizophrenia. His application was denied initially and after a hearing held in January 2007 before Administrative Law Judge ("ALJ") Randolph E. Schum. (R.[1] at 26, 53-57, 501-11, 676-86.) At Plaintiff's request, the Appeals Council granted review

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

and remanded for further evaluation of Plaintiff mental impairment, including obtaining a consultative mental status examination and medical source statements about his current abilities, evaluating his mental impairments in accordance with the regulations, and, if necessary, obtaining "supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base." (Id. at 568-69.) On remand, his application was again denied following a hearing in September 2008 before ALJ Jhane Pappenfus. (Id. at 11-24, 687-722.) The Appeals Council denied Plaintiff's request for review, effectively adopting the latest ALJ's decision as the final decision of the Commissioner. (Id. at 4-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the first administrative hearing.

Plaintiff testified that he was then 44 years old. (Id. at 678.) He dropped out of school in the eleventh grade. (Id.) He has been in prison for possession of cocaine and nonpayment of child support. (Id. at 679.) At one time, Plaintiff took care of his son. (Id. at 682.) He no longer did because he has no income. (Id.) He also has two daughters, one who is seventeen years old and the other who is twenty-three. (Id.) As a condition of his parole, he has to get a General Equivalency Degree (GED). (Id. at 682.) He is still attending classes for it. (Id.)

He has a plastic hip bone as a result of being shot a couple of times. (Id. at 679.) His leg with the plastic bone hurts when the weather changes and is shorter than the other. (Id.) He also has a gunshot wound to his lung. (Id.) His doctor has told him to stop smoking, but

he has not.  (Id. at 680.)  He smokes one to one and one-half packs of cigarettes a day.  (Id.)

Plaintiff used to drink, but stopped ten years earlier.  (Id.)  He probably stopped smoking marijuana two or three years ago.  (Id.) He stopped using cocaine ten to twelve years ago.  (Id.)

Plaintiff goes to the Hopewell Center because he hears voices.  (Id. at 681.)  Plaintiff first testified that he gets a shot once a month.  (Id.)  Six questions later, he testified that gets a shot once a week and sees a doctor, Dr. Krojanker, every three months.  (Id.)

In addition to the gunshot wounds and hearing voices, Plaintiff cannot work because of the medication he takes; specifically, it makes him sleepy.  (Id. at 682.)  The longest he has held a job has been for four months.  (Id. at 681.)

After Plaintiff's brief testimony, the ALJ described for Ms. Young the following hypothetical individual.

> [A] hypothetical Claimant, age 43, education as far as completing the 10th grade, no past relevant work at [substantial gainful activity] and it's been opined that this hypothetical Claimant can lift and carry up to 20 pounds occasionally, 10 pounds frequently, sit for six hours out of eight, stand or walk six hours out of eight, can occasionally climb stairs and ramps, never ropes, ladders and scaffolds and should avoid concentrated exposure to fumes, odors, dust and gases and the hazards of unprotected heights.  He's also able to understand, remember and carry out at least simple instructions and detailed tasks, respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, can adapt to routine simple work changes and can take appropriate precautions to avoid hazards.

(Id. at 684.)  Asked if there was any work available for such an individual, Ms. Young replied that there was.  (Id.)  For example, such an individual could work as a dining room and

cafeteria helper and do light janitorial work.  (<u>Id.</u> at 685.)  If such an individual had the residual functional capacity (RFC) described by Dr. Krojanker, see pages 20 and 21, below, there was no work this individual could perform.  (<u>Id.</u>)

Plaintiff, still represented by counsel, and Delores E. Gonzalez, M.Ed., testified at the second hearing.

Before any testimony was given, Plaintiff amended his alleged onset date to November 4, 2005.  (<u>Id.</u> at 513, 692.)

Plaintiff testified that he had completed the eleventh grade and was currently studying for the GED.  (<u>Id.</u> at 693.)  He has no vocational training, has not been to a vocational technical institute, and has not participated in vocational rehabilitation.  (<u>Id.</u> at 694.)  He did not work when in prison.  (<u>Id.</u>)  He has been in prison twice and has been locked up three or four times for such things as traffic violations.  (<u>Id.</u> at 695.)  The first time he was in prison was for possession and the second time was for back child support.  (<u>Id.</u> at 696.)  Asked by the ALJ about a reference in his prison records to having abused drugs for thirty years, Plaintiff replied that he had been off drugs for almost twenty years.  (<u>Id.</u>)  He stopped using drugs when he was in his 20s.  (<u>Id.</u> at 697.)

Plaintiff lives with his fiancé, and has done so for the past four to five years.  (<u>Id.</u> at 699-700.)  She is currently on disability.  (<u>Id.</u> at 708.)

Plaintiff testified that he was currently being treated by a psychiatrist, Dr. Krojanker.  (<u>Id.</u> at 697.)  He started seeing him in approximately 1989 and has been seeing him since, with the exception of the times when he was in jail.  (<u>Id.</u> at 698.)  He currently sees Dr. Krojanker

every three months; each session lasts approximately thirty minutes.  (Id. at 698-99)  He gets a shot every month regardless of whether he sees the doctor.  (Id. at 698)  The shot helps alleviate his feelings that others might harm him.  (Id. at 702.)  As long as he has the shots, he is fine.  (Id.)  The effects of the shots last for twenty-five to twenty-six days.  (Id. at 703.)  As the effects wear off, his feelings that others might harm him resurface during the four to five days before the next shot.  (Id.)  During those four to five days, Plaintiff drinks a lot of coffee.  (Id. at 710.)  He does not like to listen to music then or be around people.  (Id. at 710-11.)  His fiancé will not let anyone bother him then.  (Id. at 711.)  He reported what happened when the shots wore off to his doctors approximately one year ago.  (Id.)  The only side effects he has from the shots are from when the shots are wearing off.  (Id. at 712.)

Plaintiff last heard voices about one month ago.  (Id. at 700.)  Before that, it had been approximately one and one-half years.  (Id. at 701.)  He also has visual hallucinations, with the most recent being one month earlier.  (Id.)  This happened when he tried to go to sleep.  (Id. at 701-02.)

Plaintiff takes two buses to get to Hopewell Center where he gets his shots.  (Id. at 704.)  He is generally there on time.  (Id.)

He watches television at home with his fiancé.  (Id.)  They sometimes go out to dinner or to the park or movies.  (Id. at 705.)  They also go to her mother's house.  (Id. at 706.)  He goes grocery shopping with his fiancé.  (Id.)  With help, he does the yard work.  (Id. at 708.)  His seventeen-year old son washes the car.  (Id. at 708, 709.)  He plays "a little basketball and softball."  (Id. at 709.)

Asked by his attorney if he has any difficulty following instructions, Plaintiff replied that he did "a little bit." (Id. at 707.) He is "unfocused" most of the time. (Id.) He also has trouble remembering what he is supposed to do. (Id.)

Asked by the ALJ if Plaintiff was alleging any physical impairment, counsel replied that he was not currently alleging any severe physical impairments. (Id. at 710.)

Ms. Gonzalez, testifying as a vocational expert (VE), testified that Plaintiff's prior work as a janitor was classified as heavy and unskilled. (Id. at 715.) The ALJ then described Plaintiff as someone who is limited to medium exertional unskilled work and who can make simple work-related decisions, respond appropriately to co-workers and supervisors, and have occasional contact with the public. (Id. at 716.) The VE stated that such a person could work as a janitor as the job was customarily performed in the national and local economies. (Id.) Such person could also work as a housekeeper/cleaner, a light unskilled job; as an assembler, a sedentary, unskilled job; and as an addresser, also sedentary, unskilled. (Id. at 716-17.) These jobs exist in significant numbers in the national and local economies. (Id.)

Plaintiff's counsel then described a hypothetical person with additional limitations. (Id. at 717-18.) This person had a mental limitation that (i) seriously interfered with his ability to function independently; (ii) markedly restricted his ability to cope with normal work stress, to behave in an emotionally stable manner and be reliable, to relate in social situations, to interact with the general public, and to maintain socially acceptable behavior; (iii) limited his ability to concentrate, persist, pace himself, understand and remember simple instructions, make simple work-related decisions, be punctual, maintain regular attendance, complete a

normal work day and work week without interruptions from symptoms, respond to changes in work setting, and work in coordination with others; and (iv) extremely restricted his ability to maintain attention and concentration for extended periods and to sustain an ordinary routine without special supervision. (Id. at 718-19.) According to the VE, such a person could not perform the jobs she previously outlined. (Id. at 720.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, evaluation reports, and Plaintiff's criminal record.

When applying for SSI, Plaintiff completed a Function Report. (Id. at 100-07.) He described his daily routine as watching television, eating breakfast and lunch, taking a nap, and taking medication. (Id. at 100.) If he had a doctor's appointment, he would go to it. (Id.) He did not take care of anyone else or any pets. (Id. at 101.) He did not lift any heavy objects because of his plastic hip bone. (Id.) He did not need any reminders to take care of his personal needs and grooming, but did need to be reminded to take his medication. (Id. at 102.) His family cooked for him. He mowed the lawn, cleaned the driveway, mopped the floors, and did the laundry. (Id.) He shopped for groceries once a month and for clothes once every one to three months. (Id. at 103.) His impairments affected his ability to lift, bend, walk, remember, concentrate, understand, follow instructions, and get along with others. (Id. at 104.) He could not walk far without getting tired and having to rest for fifteen minutes; he could not bend without his back hurting. (Id.) He could not pay attention for longer than two

to three minutes.  (<u>Id.</u>)  He did not follow instructions well, but did better with written instructions than spoken.  (<u>Id.</u>)  He spent time once a week with his girlfriend and children, watching television, going out to eat, and taking his children to the movies.  (<u>Id.</u> at 105.)  His medication made him think people were after him.  (<u>Id.</u> at 106.)  He got along okay with authority figures.  (<u>Id.</u>)

Plaintiff also completed a Disability Report.  (<u>Id.</u> at 116-25.)  He listed his height as 6 feet and his weight as 150 pounds.  (<u>Id.</u> at 116.)  A plastic hip bone and schizophrenia limited his ability to work. (<u>Id.</u> at 117.)  These impairments first bothered him on December 1, 1994, and prevented him from working that same day.  (<u>Id.</u>)  He receives treatment for his impairments from the Hopewell Center.  (<u>Id.</u> at 120.)  He was incarcerated from July 2005 to November 1, 2005.  (<u>Id.</u> at 121.)  He completed the eleventh grade in 1982 and had no further education or vocational training.  (<u>Id.</u> at 123.)

Plaintiff answered "no pain" on a questionnaire asking him what kind of pain he had. (<u>Id.</u> at 108.)

On a Work History Report, Plaintiff listed two jobs as a janitor, one from 1990 to 1991 and one from 1994 to 1995, and one job as a groundsman, from 1992 to 1993.  (<u>Id.</u> at 109-15.) A report of his annual earnings for 1979 to 1998, inclusive, lists earnings for only five years. (<u>Id.</u> at 59, 583.)  The highest $3,227.94, was in 1993; the lowest, $130.96, was in 1988.  (<u>Id.</u>)

On another form, Plaintiff listed three medications he was currently taking: Haldol,[2] for psychosis, and Doxepam and Benadryl, both for sleep.  (Id. at 592, 619.)  All were prescribed by Dr. Krojanker.  (Id.)

In 1987, Plaintiff pled guilty to possession of cocaine and was confined for a total of approximately ten months.  (Id. at 597-98, 604.)  In 2005, he pled guilty to two counts of nonsupport.  (Id. at 599-601, 612-14.)  After serving 120 days, his sentence was suspended and he was placed on probation for five years.  (Id. at 64, 614.)  He was discharged from probation in July 2007.  See State v. Thomas, 2104R-02899-01 (Mo. Cir. Ct. July 7, 2007) (available at Missouri Case.net, https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Aug. 31, 2010)).

Records from the Missouri Department of Corrections are dated from July 6, 5005, to November 3, 2005, when Plaintiff was released.  (R. at 474-96.)  In his initial evaluation, it was noted that his current medications included Haldol and Benadryl.  (Id. at 483.)  While

---

[2]The records from Hopewell Center list Haldol decanoate as the medication.  Haldol decanoate is an antipsychotic drug used, among other things, to manage patients with chronic schizophrenia.  See Physicians' Desk Reference, 2337 (55th ed. 2001).  Haldol decanoate is a form of Haldol used for intramuscular injection and "has a markedly extended duration of effect."  Id. at 2336.

confined, Plaintiff was given monthly Haldol injections. (Id. at 490, 492, 494-96.) His

Global Assessment of Functioning[3] values varied between 70 and 65.[4] (Id. at 491-92, 495.)

The medical records before the ALJs are either from Hopewell Center or Christian Hospital. The Hopewell Center records are summarized below in chronological order, followed by a summary of the records from Christian Hospital.

On January 30, 1996, an intake screening form was completed for Plaintiff at Hopewell Center. (Id. at 211-15.) Plaintiff reportedly appeared recalcitrant and alienated. (Id. at 211.) He elected not to disclose information about his presenting problems, medical history, or legal history. (Id. at 212-13.) His speech was coherent; his thought process was relevant. (Id. at 214.) He seemed "mildly dysphoric."[5] (Id.)

Ibe O. Ibe, M.D., conducted a psychiatric evaluation of Plaintiff on February 23. (Id. at 229-30.) Plaintiff had been receiving shots at Malcolm Bliss Hospital for the past four to five years and had recently been told to start getting them at the Hopewell Center. (Id. at 229.) He reported that he also drank and had been admitted to Malcolm Bliss the month

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[4]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic Manual at 34.

[5]Dysphoria is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." Stedman's Medical Dictionary, 534 (26th ed. 1995).

before after getting drunk and becoming very argumentative. (<u>Id.</u>) He drank between six to seven twenty-four ounces of beer a day and never got drunk. (<u>Id.</u>) He planned to quit drinking. (<u>Id.</u>) He had been sent to the penitentiary for three years for possession of drugs. (<u>Id.</u>) He had not used drugs for "quite awhile." (<u>Id.</u>) On examination, he was alert and oriented to time, person, and place. (<u>Id.</u>) He spoke clearly and coherently. (<u>Id.</u> at 229-30.) His diagnosis was schizophrenia paranoid. (<u>Id.</u> at 230.)

An April 1 notation in his record indicates that he was feeling better. (<u>Id.</u> at 175.)

The 1996 records list shots of 75 milligrams of Haldol decanoate given to Plaintiff on April 9, May 1, June 14. July 15, August 12, September 9, October 7, November 1, and December 9. (<u>Id.</u> at 173-75.)

On August 13, 1997, Plaintiff had no complaints and was reportedly doing well. (<u>Id.</u> at 178.)

Another intake screening form was completed for Plaintiff on September 8. (<u>Id.</u> at 206-10.) Plaintiff was described as being "acceptably attired." (<u>Id.</u> at 206.) He reported having episodes of perceptual disorder with auditory sensation beginning five years earlier. (<u>Id.</u> at 206-07.) He enjoyed baseball and basketball; he denied substance abuse. (<u>Id.</u> at 208.) His speech was coherent; his thought was relevant; his affect was blunt and harmonized with his thought content. (<u>Id.</u> at 209.) He was oriented to time, person, and place. (<u>Id.</u> at 210.)

Plaintiff was given 75 milligrams of Haldol decanoate on February 3, March 3, April 7, July 7, August 4, September 8, and November 5. (<u>Id.</u> at 173, 176-77, 181, 228.)

Dr. Ibe conducted an annual psychiatric evaluation of Plaintiff on January 28, 1998. (Id. at 226-27.) Plaintiff reported that he had been having auditory hallucinations "on and off" since having a nervous breakdown seven years ago. (Id. at 226.) He had had two hospitalizations for psychiatric purposes. (Id.) He had a history of alcohol use, but had stopped drinking. (Id.) Dr. Ibe's diagnosis was schizophrenia, paranoid type. (Id.) Plaintiff's GAF was 42.[6] (Id. at 227.) The dosage of Haldol decanoate was 100 milligrams. (Id.)

On April 8, Plaintiff reported that he was doing well. (Id. at 150.)

An August 14 progress note by Dr. Ibe reported that Plaintiff had stated that he was doing well on his injections, but their effect started to wear off the week before the next shot. (Id. at 225.) Plaintiff did not want, however, an increase in the medication. (Id.) He felt he was okay, and he was sleeping well. (Id.) The diagnosis was schizophrenia, residual; the GAF was 45.[7] (Id.) The dosage of Haldol decanoate continued at 100 milligrams. (Id.)

An October 13 progress note by Dr. Ibe reported that Plaintiff described himself as doing well. (Id. at 224.) He felt his medications were "very helpful." (Id.)

Plaintiff was given 100 milligram shots of Haldol decanoate on February 4, March 4, April 8, May 12, September 14, October 13, November 17, and December 15. (Id. at 149-50, 179.)

---

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

[7]See note 6, supra.

A March 23, 1999, progress note by Dr. Ibe reported that Plaintiff occasionally heard voices, particularly at the end of the four-week period for shots. (Id. at 223.) Plaintiff informed Dr. Ibe that he was able to deal with the hallucinations, which had not been too much of a problem. (Id.) He felt he was doing "quite well." (Id.) Dr. Ibe noted that Plaintiff had no evidence of extrapyramidal dyskinesias, or abnormal involuntary movements. (Id.) The diagnosis was schizophrenia, residual; the GAF was 55.[8] (Id.)

That same day an intake screening form was completed for Plaintiff. (Id. at 201-06.) He was appropriately attired and lived with his father. (Id. at 201.) He heard voices and began having a noticeable difficulty seven years ago. (Id. at 202.) He had no difficulty with substance abuse. (Id. at 203.) He enjoyed playing basketball and cork ball. (Id.) His speech was coherent; his thought process was relevant. (Id. at 204.) He reported feeling alright. (Id.) He was oriented to time, place, and person, and denied any difficulty with forgetfulness. (Id. at 205.)

Dr. Ibe conducted an annual psychiatric evaluation of Plaintiff on August 10. (Id. at 221-22.) Plaintiff reported having been hospitalized several times. (Id. at 221.) He used to drink heavily, but stopped. (Id.) He did not use drugs. (Id.) He had been hearing voices, but they were "very minimal." (Id.) He stated that he was doing well and had no problems. (Id.) He was alert and oriented to time, place, and person. (Id.) Dr. Ibe prescribed 100 milligrams

---

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34.

of Haldol to be administered every four weeks and 50 milligrams of Mellaril to be taken twice a day.[9]  (Id.)  The diagnosis was schizophrenia, residual; Plaintiff's GAF was 60.[10]  (Id.)

Plaintiff was given 100 milligram shots of Haldol decanoate on June 15, July 13, August 10, September 7, October 5, November 9, and December 7.  (Id. at 148, 153.)

An annual evaluation on February 15, 2000, noted that Plaintiff's last hospitalization was two years ago.[11]  (Id. at 200.)  Plaintiff reported having no active problems.  (Id.)  He was unemployed and receiving social security.[12]  (Id.)  He watched television and played basketball.  (Id.)  He had never been arrested and had not abused alcohol or drugs for the past four years.  (Id.)  He denied being depressed and having hallucinations or delusions.  (Id.)  His affect was appropriate, and he was oriented to time, place, and person.  (Id.)  His current GAF  was 54.[13]  (Id.)

Treatment notes dated July 5 report that Plaintiff was nervous, but slept and ate well.  (Id. at 154.)  He drank eight cups of coffee a day and played basketball.  (Id.)  He was diagnosed with tobacco dependence – he smoked one pack of cigarettes a day – and schizophrenia.  (Id.)  His GAF was 54.  (Id.)

_____

[9]Mellaril is an antipsychotic medication prescribed for the treatment of mental disorders such as schizophrenia.  Drugs.com, http://www.drugs.com/search.php?searchterm=mellaril (last visited Sept. 2, 2010).  This is the only reference in the records to it being prescribed for Plaintiff.

[10]See note 8, supra.

[11]The signature on the form is illegible, but does not resemble Dr. Krojanker's.

[12]There is no indication in the record that Plaintiff was receiving any social security benefits.

[13]See note 8, supra.

Plaintiff was given 100 milligram shots of Haldol decanoate on January 8, February 15, May 9, June 6, July 5, August 2, August 30, and September 27.  (<u>Id.</u> at 152, 153.)

A June 22, 2001, notation reports that Plaintiff had no delusions.  (<u>Id.</u> at 155.)

On December 13, a screening form was completed.  (<u>Id.</u> at 193-99.) Plaintiff was described as being acceptably attired and living with his father and wife.  (<u>Id.</u> at 193.)  His problem, present for the past ten years, was an episodic perceptual disorder with auditory sensation.  (<u>Id.</u> at 193-94.)  He enjoyed baseball, and had no difficulties with substance abuse.  (<u>Id.</u> at 196.)

In 2001, his shots of Haldol decanoate were 75 milligrams and were given on June 22, July 25, August 22, and September 19.  (<u>Id.</u> at 155.)

Plaintiff reported at his May 15, 2002, session that he was having less auditory hallucinations.  (<u>Id.</u> at 159.)

He was given shots of 75 milligrams of Haldol decanoate on February 13, March 13, April 16, May 15, June 12, July 11, August 8, October 3, November 5, and December 3.  (<u>Id.</u> at 143-44, 156, 165.)

On July 11, 2003, a screening form was again completed for Plaintiff.  (<u>Id.</u> at 186-92.) Plaintiff was described as being acceptably attired and living with his father.  (<u>Id.</u> at 186.)  His presenting problem was an episodic perceptual disorder with auditory sensation.  (<u>Id.</u>)  He had an eleventh grade education and was receiving social security disability.  (<u>Id.</u> at 188.)  He "denie[d] any difficulty with the law," but had a civil suit arising out of an automobile accident.  (<u>Id.</u>)  He had not abused substances for thirteen years.  (<u>Id.</u>)  His speech was

coherent; his thought process was relevant. (Id. at 190.) He had an euthymic, but appropriate affect and was oriented to person, place, and time. (Id. at 192.)

Plaintiff's dosages of Haldol decanoate continued to be 75 milligrams. He was given shots on January 8, February 12, March 12, April 17, May 16, June 13, August 13, September 17, and October 17. (Id. at 137, 144, 147, 162, 171.)

Plaintiff saw Rolf Krojanker, M.D., on February 11, 2004, for thirty minutes. (Id. at 220.) The two-paragraph, six-line report describes Plaintiff as doing "reasonably well, stabilizing on the shots and Benadryl, and sleeps, eats, and digests satisfactorily." (Id.) Dr. Krojanker noted that Plaintiff had been invited to go Alcoholics Anonymous (AA) but had shown no interest. (Id.) Plaintiff stated that he was abstinent. (Id.)

On September 10, Plaintiff's case manager, Eric May, completed a psychosocial/clinical assessment of Plaintiff. (Id. at 499-500.) He reported that Plaintiff was able to prepare his own meals and use public transportation. (Id. at 499.) He lived with his father. (Id. at 500.) He had been asymptomatic for a year. (Id.) Plaintiff "was expected to maintain stability and continue advancement with personal independence." (Id. at 499.)

Plaintiff received shots of Haldol decanoate on January 8, February 11, March 10, April 6, May 5, June 10, July 8, August 17, September 16, October 8, November 12, and December 15. (Id. at 140-42, 166-67.)

Dr. Krojanker evaluated Plaintiff on April 6, 2005, and June 29 for a total of sixty minutes. (Id. at 218-19.) He described Plaintiff as being oriented to time, place, and person and being dressed and groomed "within normal limits." (Id. at 218.) He watched television

and cared for a thirteen-year old boy.  (Id.)  He smoked a pack of cigarettes a day.  (Id.)  He had been to AA, but had not completed the program.  (Id.)  His diagnosis was schizophrenia, chronic undifferentiated type.  (Id. at 219.)  His current GAF was 40.[14]  (Id.)

Also on April 6, Mr. May completed a psychosocial/clinical assessment of Plaintiff. (Id. at 497-98.)  He reported that Plaintiff "was living in a house with female paramour and receives social security entitlement."  (Id. at 497.)  Plaintiff denied any difficulty with the law. (Id.)  Plaintiff "was expected to maintain stability and continue advancement with personal independence."  (Id.)

Plaintiff was given shots of Haldol decanoate on January 25, February 24, March 25, April 26, May 21, June 19, and December 21.  (Id. at 138-39, 142, 168-69.)  A notation was made when Plaintiff was given this last shot that he had been locked up for a couple of months.[15]  (Id. at 138.)

An assessment form was completed for Plaintiff on January 3, 2006.  (Id. at 182-83.) The diagnosis was psychotic disorder, not otherwise specified.  (Id. at 182-83.)  His most recent GAF was 45.[16]  (Id.)  He had an 80% record of compliance with his medication.  (Id. at 183.)

---

[14]A GAF between 31 and 40 is indicative of "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  Diagnostic Manual at 34.

[15]See page 9, supra.

[16]See note 6, supra.

Dr. Krojanker saw Plaintiff on June 7 for a fifteen-minute session. (Id. at 127-29.) Plaintiff continued to smoke one pack of cigarettes a day. (Id. at 127, 128.) He wanted to resume taking Benadryl because he was having trouble sleeping. (Id.) He drank three cups of coffee a day and ate two meals and three snacks. (Id.) He was given a prescription for hydroxyzine, an anti-anxiety medication that also acts as an antihistamine, and 75 milligrams of Haldol decanoate, to be given intramuscularly once a month. (Id.) Plaintiff was to return in three months. (Id.) The diagnosis was schizophrenia, schizoaffective type chronic. (Id. at 128.) His GAF was 40.[17] (Id.)

A shot of 75 milligrams of Haldol decanoate was given Plaintiff on January 6, February 10, March 14, April 13, and May 18. (Id. at 134-36, 138, 172.) At the March 14 visit, Plaintiff was described as being verbally assaultive toward his significant other. (Id. at 135.)

When Dr. Krojanker saw Plaintiff on July 5, 2007, for a fifteen-minute session, he noted that Plaintiff had missed his last, April appointment. (Id. at 645.) He described Plaintiff as quiet and passive. (Id.)

Plaintiff was given a shot of 75 milligrams of Haldol decanoate on December 5. (Id. at 651.)

When Dr. Krojanker saw Plaintiff on June 5, 2008, he described him as being uninterested in changing and as wanting to continue as he was. (Id. at 649.) He was inactive,

_____

[17]See note 14, supra.

watched televison for two hours, and listened to the radio for two hours.  (Id.)  He was going to get his GED, but did not appear to be doing so any time soon.  (Id.)

After a fifteen-minute session with Plaintiff on September 27, Dr. Krojanker reported that Plaintiff wanted an increase in sleep medication.  (Id. at 644.)  He also noted that Plaintiff was smoking two packs of cigarettes a day, including smoking at night.  (Id.)

When Dr. Krojanker saw Plaintiff on December 20 he described him as being "groomed and dressed within normal limits."  (Id. at 650.)  Plaintiff wanted a prescription for sleep and depression.  (Id.)  He was smoking one to one and a half packs of cigarettes a day and drinking two to three cups of coffee.  (Id.)

In 2008, Plaintiff was given shots of 75 milligrams of Haldol decanoate on January 9, February 13, March 13, April 17, May 13, June 10, July 10, and August 4.  (Id. at 648, 652-54.)

The earliest of Plaintiff's medical records from Christian Hospital is from April 30, 2006, when he there with complaints of right-sided upper back pain that was not relieved by over-the-counter medications and with a dry cough for the past few weeks; he was diagnosed with a right lung abscess.  (Id. at 232-447, 456-69, 639-41.)  The impression was of an infected right upper lobe.  (Id. at 640.)  A chest tube placed on May 5.  (Id. at 638.)  After the lung was drained and he was given antibiotics, he was discharged on May 9.  (Id. at 234.)  During his hospitalization, his schizophrenia was described as stable.  (Id. at 263, 268.)

Plaintiff was treated in the hospital's emergency room on October 25 after being in a motor vehicle accident.  (Id. at 621-32.)  Plaintiff had been the driver in a car that was struck

on the driver's side by another vehicle.  (Id. at 621, 624.)  He presented with complaints of moderate back pain, was diagnosed with a muscle strain, and was released with prescriptions for Flexeril and Ibuprofen.  (Id. at 621, 627-28, 631.)

Included in the record before the ALJs were two Mental Medical Source Statements (MSS) completed at Plaintiff's counsel's request.

One Mental MSS was completed by Dr. Krojanker on March 16, 2006.  (Id. at 130-33.) The Mental MSS rated Plaintiff's limitations in various areas as mild, moderate, marked, or extreme.  (Id.)  He was markedly limited in all seventeen abilities, i.e., in his ability to cope with normal work stress, function independently, behave in an emotionally stable manner, maintain reliability, relate in social situations, interact with the general public, accept instructions and respond to criticism, maintain socially acceptable behavior, understand and remember simple instructions, make simple work-related decisions, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from symptoms, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of rest periods, sustain an ordinary routine without special supervision, respond to changes in a work setting, and work in coordination with others.  (Id. at 130-31.)  In the past year, he had had three episodes of decompensation.  (Id. at 132.)  He did *not* have a substantial loss of his ability to understand, remember, and carry out simple instructions; to make judgments that were commensurate with the functions of unskilled work; to respond appropriately to supervision, co-workers, and usual work situations; or to deal with changes in a routine work setting.  (Id.)  Asked for his

opinion whether the limitations he had described had lasted, or could be expected to last, at least twelve continuous months, Dr. Krojanker marked "yes." (Id.)  Asked for the date of onset, he answered, "1996 or before." (Id.)  The diagnosis was schizophrenia, chronic paranoid type. (Id. at 133.)  Plaintiff's most recent GAF was 40, as was the highest and the lowest in the previous year. (Id.)

A Mental MSS completed the same day by Plaintiff's case manager, Eric May, mirrored that of Dr. Krojanker with one exception. (Id. at 470-73.)  Mr. May assessed Plaintiff has having a substantial loss of his ability to respond appropriately to supervision, co-workers, and usual work situations. (Id. at 472.)

### The First Decision

ALJ Schum found that Plaintiff had severe impairments of schizophrenia and status-post hip reconstruction. (Id. at 504.)  These impairments did not, however, meet or medically equal an impairment of listing-level severity. (Id.)  After outlining Plaintiff's testimony and summarizing the medical record, the ALJ found the opinion of Dr. Krojanker that Plaintiff would have marked limitations in various activities to be inconsistent with his opinion, noted in the same MSS, that Plaintiff did not have a substantial loss in various broad categories of abilities. (Id. at 507.)  Moreover, his opinions were rendered at the request of Plaintiff's attorney and not in the normal course of treatment. (Id.)  Additionally, the ALJ found that the medical records did not support any lasting problems with Plaintiff's hip or lung abscess. (Id.)  Plaintiff was frequently without prescribed pain medication and, with the exception of Dr. Krojanker's MSS, had never had any physician impose any long term, significant, adverse

mental or physical limitations on his functional capacity.  (Id.)  There as no evidence that

Plaintiff had required surgery or prolonged hospitalization since his alleged onset date, had

required the prolonged use of an assistive device, or had sought treatment on a regular basis

through physical therapy, a work hardening program, or a pain clinic.  (Id. at 508.)

The ALJ found Plaintiff's description of his symptoms and functional limitations to be

not credible.  (Id.)  The ALJ further found that Plaintiff did have some limitations.  (Id.)

Specifically, Plaintiff could not lift more than ten pounds frequently or twenty pounds

occasionally; could not stand, walk, or sit for longer than six hours in an eight-hour work day;

could not climb ropes, ladders or scaffolds; could not be exposed to fumes, odors, gasses,

dust, unprotected heights, hazards; could not carry out more than simple instructions; and

could not climb stairs and ramps more often than occasionally.  (Id.)  With this RFC, Plaintiff

could, according to the VE's testimony, perform several jobs existing in significant numbers

in the national and state economies.  (Id. at 509.)  Plaintiff was not, therefore, disabled within

the meaning of the Act.  (Id. at 510.)

## The Second Decision

After outlining the Commissioner's five-step sequential evaluation process, the ALJ

found at step one that Plaintiff had not engaged in substantial gainful activity at any relevant

time and, at step two, that he had severe impairments of a previous lung abscess and paranoid

schizophrenia.  (Id. at 16.)  His hip impairment was found not to be severe based on his

hearing testimony.  (Id.)

The ALJ next found at step three that Plaintiff's severe impairments did not meet or medically equal, singly or in combination, the criteria of Listing 12.04 (affective disorders) or 12.06 (anxiety related disorders). (Id. at 17.) Specifically, his "wide range of daily activities," including grocery shopping, going to the park with his fiancé, visiting his fiancé's mother, and playing basketball and softball, his regular sleeping and eating habits, and his recently normal grooming and dressing did not reflect the severity of his alleged complaints and symptoms. (Id.) Dr. Krojanker's MSS did reflect that severity; however, the MSS was inconsistent with Plaintiff's testimony and was internally inconsistent as Dr. Krojanker also found no substantial loss of various abilities. (Id.) Moreover, the MSS was rendered after only a few sessions. (Id.) Also noting that Plaintiff had a long-term relationship with his fiancé, the ALJ found that the record supported only a mild limitation in his social functioning. (Id. at 17-18.)

Plaintiff's most severe limitations were in the area of concentration, persistence, and pace. (Id. at 18.) He was no more than moderately impaired in this area. (Id.) He had not had an episode of deterioration or decompensation in a work or work-like setting. (Id.)

Addressing the question at step four of Plaintiff's RFC, the ALJ concluded that he could lift twenty-five pounds frequently and fifty pounds occasionally; could stand and/or walk six hours in an eight-hour day; could sit six hours in an eight-hour day; could only occasionally climb ropes, ladders, and scaffolds; had to avoid concentrated exposure to fumes, odors, gasses, dust, and unprotected heights or hazards; and should avoid more than casual infrequent contact with others. (Id. at 19.) Because of Plaintiff's mental impairments, he was

limited to jobs that required no more than simple, one or two step instructions. (<u>Id.</u>) In so concluding, the ALJ evaluated Plaintiff's testimony at both hearings and reviewed the medical records. (<u>Id.</u> at 19-22.) Plaintiff had no past relevant work. (<u>Id.</u> at 22.)

Given Plaintiff's age, education, and RFC, Plaintiff could, according to the VE, perform jobs that existed in significant numbers in the national and state economies. (<u>Id.</u> at 23.) He was not, therefore, disabled within the meaning of the Act. (<u>Id.</u> at 24.)

### <u>Additional Medical Record Before the Appeals Council</u>

Plaintiff submitted to the Appeals Council the report of F. Timothy Leonberger, Ph.D., of his consultative examination of Plaintiff on January 7, 2009.

Dr. Leonberger reported that when asked why he could not work full-time, Plaintiff explained that he got a shot of Haldol that made him drowsy and he could not lift anything too heavy because he had a gunshot wound and a hip replacement. (<u>Id.</u> at 664.) He left school in the eleventh grade because he wanted to be on the streets. (<u>Id.</u> at 665.) He had never attained a GED. (<u>Id.</u>) He had first been "psychiatrically hospitalized" for four to five moths in 1989 after abusing marijuana, phencyclidine (PCP), and crack cocaine for four to five months. (<u>Id.</u>) He had also been admitted to Deaconess Hospital and Malcom Bliss Hospital for psychiatric reasons, but could not remember the dates. (<u>Id.</u>) Although he had had lung problems, he smoked two packs of cigarettes a day. (<u>Id.</u>) Until three months ago, he had daily drunk six twenty-four ounce beers. (<u>Id.</u>) Until six months ago, he used marijuana. (<u>Id.</u>)

Plaintiff further reported to Dr. Leonberger that he lived with his fiancé, his son, and her granddaughter. (Id.) He watched television, sat on his porch, and drank coffee. (Id.) He did not drive because he did not have a license, and needed to pay a fine in order to get one. (Id.) He could do laundry, cook, clean, and help his fiancé with grocery shopping. (Id. at 666.) He had a few friends. (Id.)

On examination, Plaintiff was alert and oriented to person, place, time, and situation. (Id.) His speech was minimal and included simple vocabulary. (Id.) His thinking "was generally logical although he did have some problems remembering events in his past history" and with sequencing. (Id.) He had no current psychotic problems, but sometimes began hearing voices several days before he was due for a Haldol shot. (Id.) The last time this happened was six months ago. (Id.) His attention and concentration were adequate for the assigned tasks. (Id.) His mood was euthymic; his affect was "quite blunt." (Id.) On the WAIS-III, he had a verbal IQ score of 66, a performance IQ score of 76, and a full scale IQ score of 67. (Id.) The first and third scores were in the extremely low range. (Id. at 667.)

Dr. Leonberger's impression was as follows.

[Plaintiff] has an extremely long and well documented history of Schizophrenia. He primarily demonstrates the negative symptoms of Schizophrenia including apathy, social withdrawal, poor motivation, and blunt effect. His psychotic symptoms of auditory hallucinations and delusions are well controlled by monthly Haldol D shots. . . . I believe what most likely has occurred with [Plaintiff] is that his intellectual functioning has declined since the onset of his Schizophrenia and that he was previously functioning in the borderline range of intelligence.

(Id.) His current GAF was 40, as was his highest GAF in the past year. (Id.)

Addressing Plaintiff's functional limitations, Dr. Leonberger found him to have a marked impairment in all four activities of daily living[18] and all five abilities of social functioning.[19] (Id. at 668-69.) Plaintiff was moderately limited in one ability in the area of concentration, persistence, or pace, i.e., understanding and remembering simple instructions; was markedly limited in two activities, i.e., making simple work-related decisions and performing at a consistent pace without an unreasonable number and length of breaks; and was extremely limited in two activities, i.e., maintaining attention and concentration for extended periods and sustaining an ordinary routine without special supervision. (Id.) Dr. Leonberger further opined that Plaintiff's psychologically-based symptoms would cause him to miss work at least three times a month and be late for work as often. (Id. at 670.)

When denying Plaintiff's request for review, the Appeals Council found that Dr. Leonberger's report was not supported by the record as a whole, was received months after the ALJ's decision, and was not from a treating source. (Id. at 5.) The Council also noted that Plaintiff had failed to attend a consultative examination when scheduled by the Social Security

---

[18]These four are abilities to cope with stress, function independently, behave in an emotionally stable manner, and maintain reliability.

[19]These five are abilities to relate in social situations, interact with general public, accept instructions and respond to criticism, maintain socially acceptable behavior, and work in coordination with others.

Administration.[20]  (Id.)  The Council also discounted a diagnosis of mental retardation, noting

that Plaintiff had completed the eleventh grade, had not been in special education classes, and

had been described by the case manager as having a level of intellectual functioning consistent

with his education.[21]  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable

to engage in any substantial activity by reason of any medically determinable physical or

mental impairment," which must last for a continuous period of at least twelve months or be

expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be

"of such severity that [the claimant] is not only unable to do his previous work, but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir.

2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274

F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate

analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First,

the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R.

---

[20]Plaintiff had failed twice to attend a scheduled consultative examination.  (R. at 98.)

[21]See Record at 205.

§ 416.920(b). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u> "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523. "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and

an individual's own description of his limitations."' **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past." 20 C.F.R. § 416.920(e).  "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity."  20 C.F.R. § 220.130(a).  "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work."  **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 416.920(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "However, when a claimant is limited by a nonexertional

impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that (1) the ALJ fatally failed to (a) include a narrative discussion of, and support for, her RFC findings, (b) give the appropriate weight to the opinion of Dr. Krojanker and to provide a sufficient analysis for the weight she did give it, (c) evaluate the opinion of Mr. May, and (d) properly evaluate his mental impairment under Listing 12.03, and (2) the Appeals Council failed to evaluate Dr. Leonberger's opinion under the criteria of 20 C.F.R. § 416.927(d).  The Commissioner disagrees.

As discussed above, Plaintiff has the burden at step four of establishing his RFC.  See **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004).  On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738.

In the instant case, the ALJ determined that Plaintiff had the RFC to lift twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk six hours in an eight-hour day; sit six hours in an eight-hour day; and occasionally climb ropes, ladders, and scaffolds. He had to avoid concentrated exposure to fumes, odors, gasses, dust, and unprotected heights

or hazards and should avoid more than casual infrequent contact with others. Also, he was limited to jobs that required no more than simple, one or two step instructions.

As Plaintiff notes, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." S.S.R. 96-8p, 1996 WL 374184, * 7 (Soc. Sec. Admin. July 2, 1996). In the instant case, the ALJ summarized in detail the medical and nonmedical evidence, including Plaintiff's treatment records indicating that his schizophrenia was controlled by monthly shots and the evidence that Plaintiff had maintained a long-term relationship with his fiancé, visited her mother, and played sports. Although the ALJ did not present her RFC findings in bullet points with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p. Rather, the concern of Ruling 96-8p is "that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting Ruling 96-8p). The ALJ did not, however, overlook any of Plaintiff's limitations.[22]

Also, the Court notes that an integral part of the ALJ's determination of a claimant's RFC is an evaluation of his credibility. See **Wagner**, 499 F.3d at 851, **Dukes**, 436 F.3d at 928. Although Plaintiff is not challenging the ALJ's assessment of his credibility, "the ALJ's

---

[22]As an example of the ALJ's failure to follow Ruling 96-8p, Plaintiff cites the lifting restrictions in the RFC findings. Plaintiff does not, however, quarrel with the restrictions themselves. Indeed, Plaintiff explicitly disclaimed any physical impairment as a basis for seeking SSI.

determination regarding [his] RFC was influenced by [her] determination that [his] allegations were not credible." **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010).

Plaintiff further argues that the ALJ erred by not giving the proper weight to the opinion of his treating psychiatrist, Dr. Krojanker.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009); **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001). See also **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (noting that a treating physician's opinion does not automatically control the outcome because the record must be evaluated as a whole). Title 20 C.F.R. § 416.927(d) delineates six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 416.927(d)(1)-(6). "The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A

treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

The assessments of Dr. Krojanker in his Mental MSS are not supported by his treatment notes and are internally inconsistent. The few records of Dr. Krojanker that predate the March 2006 MSS contain no observations or complaints that presage the limitations reflected in the MSS. Indeed, the most complete and closest record is of the longest session – sixty minutes – and describes Plaintiff as being oriented to time, place, and person, being normally dressed and groomed, and caring for a thirteen-year old boy.[23] Although Dr. Krojanker also considered Plaintiff's GAF to then be 40, indicating a major impairment in several areas, his notes do not include any description of any functional limitation. Moreover, while being treated by Dr. Krojanker, Plaintiff's dosage of Haldol was reduced by 25%. Dr. Krojanker also considered 1996 or earlier as being when Plaintiff's limitations first manifested themselves at the described severity. He did not treat Plaintiff until years later, and the treatment notes from 1996 and the intervening years of Dr. Ibe or Mr. May do not support Dr.

---

[23]Plaintiff argues that the ALJ's finding that Dr. Krojanker's MSS was rendered after only a few sessions is erroneous and that the ALJ should have recontacted Dr. Krojanker for clarification of the illegible notes and should have considered the treatment notes of Mr. May. The typed notes of Dr. Krojanker are inconsistent with the MSS; there is nothing in the record, nor any argument, to suggest that handwritten notes would be more supportive. Nor are the notes of Mr. May supportive of either his or Dr. Krojanker's MSSs. For instance, one note, presumably of Dr. Krojanker, describes Plaintiff as feeling fine, having no complaints, and with an euthymic affect. (See R. at 151.) Mr. May routinely described Plaintiff as being acceptably attired, oriented, with coherent thought and adequate eye contact, and without evidence of threat of imminent harm to himself or others. (See R. at 145-46, 163-64, 170, 180, 85.)

Krojanker's assessment of the severity of Plaintiff's functional limitations.[24] Accordingly, the ALJ did not err in considering Dr. Krojanker's MSS conclusions to be inconsistent with the treatment record.

Nor did the ALJ err in finding those conclusions to be internally inconsistent. Dr. Krojanker considered Plaintiff to be markedly limited in all listed activities of daily living, social functioning, and concentration, persistence, or pace. After rating Plaintiff as markedly limited in all seventeen listed activities, Dr. Krojanker opined that he did not have a substantial loss of his ability to understand, remember, and carry out simple instructions; to make judgments that were commensurate with the functions of unskilled work; to respond appropriately to supervision, co-workers, and usual work situations; or to deal with changes in a routine work setting.

The MSS defined "marked" as a "[l]imitation that serious interferes with the ability to function independently appropriately, and effectively. This level of limitation is incompatible with the ability to perform the function 8 hours a day, 5 days a week, or on an equivalent work schedule. More than moderate but less than extreme."[25] (R. at 130.) A more than marked limitation is an "extreme" one. This degree is defined in the MSS as "[a] limitation that totally precludes the patient's ability to usefully perform the designated activity or to sustain performance of the designated activity." (Id.) A "substantial loss" occurs, according

---

[24]See note 23, supra.

[25]This last description echos that of the regulations. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

to the MSS, when the claimant "cannot perform the particular activity in regular competitive employment . . . ." (Id. at 132.)  Plaintiff argues that a finding of marked limitations in the seventeen activities is not internally inconsistent with the finding of no substantial losses in other activities because, according to the MSS definitions, a substantial loss is more debilitating than a marked limitation.  It was not unreasonable, however, for the ALJ to find that an assessment that Plaintiff had such a limitation that he could not perform the activity at issue "8 hours a day, 5 days a week, or on an equivalent work schedule" was inconsistent with a finding that he did *not* have such a loss that he could not function in the category at issue "in regular competitive employment."

Plaintiff next argues that the ALJ erred by not evaluating the opinion of Mr. May. "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998).  Nor does "[a]n ALJ's failure to cite specific evidence . . . indicate that such evidence was not considered." **Id.**  The ALJ stated that she had considered the entire record.  Included in the record, as noted above, is the rating of Mr. May describing Plaintiff's limitations as being more extreme than did Dr. Krojanker.  As with Dr. Krojanker, however, Mr. May's treatment notes, see note 23, supra, do not support his conclusions.  The ALJ's failure to specifically cite Mr. May's unremarkable treatment notes does negate the substantial evidence supporting her decision.

The ALJ specifically discussed Listings 12.04 and 12.06.  Plaintiff argues she should have addressed Listing 12.03, specifically the criteria of Listing 12.03C.  The ALJ found that

Plaintiff had a severe mental impairment of paranoid schizophrenia. Listing 12.03 is for "[s]chizophrenic, [p]aranoid and [o]ther [p]sychotic [d]isorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03. The required level of severity for this Listing is met "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." Id. The requirements of C are satisfied when there is a documented history of the impairment "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities . . . and one of the following:

　　1. Repeated episodes of decompensation, each of extended duration; or

　　2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

　　3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

Id.

　　In **Karlix v. Barnhart**, 457 F.3d 742 (8th Cir. 2006), the ALJ had concluded that the claimant's impairments did not meet or equal any impairment listed in Appendix 1 to 20 C.F.R. Part 404 and had not specifically addressed any particular listing. **Id.** at 745. The Eighth Circuit rejected the claimant's argument that the ALJ should have considered whether he met the requirements for the listing for peripheral arterial disease, finding that although the ALJ had not elaborated on his conclusion, the brevity did not require reversal because that conclusion was supported by the record. **Id.** at 746. See also **Moore ex rel. Moore v.**

**Barnhart**, 413 F.3d 718, 721 n. 3 (8th Cir. 2005) ("Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion . . . ." (internal quotations omitted)).

Similarly, the records in the instant case supports the ALJ's conclusion that Plaintiff's mental impairment was not of listing-level severity.

In his final argument, Plaintiff challenges the Appeals Council's assessment of Dr. Leonberger's opinion, specifically attacking the Council's failure to then re-examine Dr. Krojanker's opinion, the Council's mischaracterization of Dr. Leonberger's diagnosis as being mental retardation when it was borderline intellectual functioning, and the Council's citation to Mr. May's observation about Plaintiff's fund of knowledge.

Because the Appeals Council considered Dr. Leonberger's records, they are part of the administrative record considered in this proceeding. See **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007). The question is then "whether the ALJ's decision was supported by substantial evidence on the record as a whole, *including the new evidence*." **Id.** (emphasis added). The answer to this question in this proceeding is "yes."

Plaintiff reported to Dr. Leonberger that a side effect, drowsiness, from the Haldol and an inability to lift anything too heavy prevented him from working. He left school because he wanted to be on the streets. Plaintiff never alleged or described any learning difficulty or impaired mental functioning. The only reference to his intellect when he was being treated

described his fund of knowledge being consistent with his eleventh-grade education.[26]  Other than his scores on the WAIS-III, there is no allegation that Plaintiff had impaired intellectual functioning.  Moreover, his description to Dr. Leonberger of his daily and social activities are inconsistent with the marked degree of limitation found by Dr. Leonberger.  For instance, he lived his fiancé, helped with household chores, and had a few friends.  Yet, he was found to be markedly limited in all abilities of social functioning.

## Conclusion

For the foregoing reasons, the ALJ's decision that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence on the record as a whole, including that which detracts from the decision.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of September, 2010.

---

[26]As correctly noted by Plaintiff, this reference was by Mr. May.  This does not detract from its accuracy.